

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA

v.                          CRIMINAL ACTION NO. 1:03CR46(K)

LEE RONALD STEVENSON,
        Defendant.

## REPORT AND RECOMMENDATION

On November 5, 2003, came the defendant, Lee Ronald Stevenson, in person and by his counsel of record, Brian J. Kornbrath, and also came the United States by Robert H. McWilliams, its Assistant United States Attorney, for hearing and disposition of Defendant's Motion to Suppress Evidence [Docket Entry 9]. By Order the motion was referred to the undersigned.

The matter came on to be heard on the motions and memoranda filed by the parties; the duly sworn testimony of BATF Special Agent Larry Michael Hake, Greg Floyd, Lewis County Deputy Sheriff Sgt. David Shawn Parks and Connie Blake; Government Exhibit 1; and the argument of counsel for the parties. Thereafter, the undersigned took the matter under advisement.

### I.

### Statement of Facts

In late November or early December, 2002 Defendant, Lee Ronald Stevenson, acting under his assumed name of Levi Yoder, met with Greg Floyd over lunch to explore the possibility of leasing an apartment Floyd owned in Weston, W. Va. Yoder and Floyd orally agreed Yoder could rent Floyd's second floor apartment at 642 Court Street on a week to week basis for $100.00 per week. Yoder gave Floyd $100.00 in cash for the first week's rent. Yoder later paid another



$100.00 for a second week's rent. However, after the second week, Yoder fell behind failing to pay the weekly rent for 5 weeks.

Yoder and Floyd met over dinner and discussed the rent situation. Yoder suggested he trade work for rent and / or he work and accumulate money to pay the overdue rent. Floyd was satisfied with the proposed arrangement and did nothing to evict Yoder or to collect the rent.

During the same time frame (late 2002) Yoder met and became friends of Connie Blake of Buckhannon, W. Va. Blake describes her relationship with Yoder as being that of "dating in the very beginning." Blake did not reside with Yoder although she was generally known to be Yoder's girlfriend.

Defendant was arrested on January 20, 2003 in West Virginia by federal authorities on a Michigan fugitive from justice warrant.

On January 21, 2003 Yoder prepared and signed Government Exhibit No. 1. In pertinent part it states:

> "On this day, Jan. 21, 2003, I <u>Lee R. Stevenson</u>, a.k.a. Levi Yoder, *former renter* of the apt. on 642 Court St. Weston W.Va. owned by Greg Floyd, hereby, *transfer/ give* <u>Ms. Connie Blake,</u> *full rights to possession and ownership* of *all my personal property* in Apt. 642, - To include but not limited to, (note: all furniture belongs to home owner ie. chars, tables, bed etc.) all clothing, all bedding, all hanging pictures/ signs etc., cowboy lamp, clock radio, an book's / magazines & publications clip board and misc. documents, briefcase combo.#707, #707 all hunting, fishing, and camping equipment or apparal *to include any weapons ie. 32 cal. pistol 30-30 rifle* onida bow/arrows silver tray with heeling equipment, floor fan, phone Play station w/. misc. C.D.'s, (1) color T.V./VCR (location in living rm), D.V.D. suround sound system w/ 5 speakers, fender guitar w/ stand, (2) motor cycle helmets, music C.D. and casset collection. D.V.D. C.D. collection, all bathroom items that are not attached, all kitchen items in/on cabinets/fridge, (except microwave). and misc. knick knacks, utensils and tools etc.
> */s/ L.R. Stevenson*
> *L.R. Stevenson - seller/owner*" .... (Emphasis added by the Court)

According to Blake, Government Exhibit 1 was either mailed or hand delivered by Defendant such that she received it sometime on Wednesday, January 22, 2003.

Several days after Defendant's arrest, Sgt. David Shawn Parks, a Lewis County, W. Va. deputy sheriff, received a fax transmission from Michigan authorities inquiring whether the sheriffs department could search a motor home owned by Defendant for evidence related to an arson that occurred in Michigan. Sgt. Parks was not involved in the original January 21, 2003 arrest of Defendant. Sgt. Parks obtained a search warrant for Defendant's motor home and searched it on January 24, 2003. Nothing was recovered from the search of the motor home which had any relevance to the subject (felon in possession of a firearm) charges. The motor home was located on the property of Chester Floyd, brother of Greg Floyd. During the process of the search of the motor home, Chester Floyd and Parks conversed about the lack of personal effects in the motor home. Chester Floyd advised Parks that Defendant was renting an apartment from Greg Floyd (also known as Grayling Floyd) and that Defendant's personal effects may be at that apartment. Chester Floyd suggested his brother would have no objection to the police searching the apartment. However, Sgt. Parks declined to search without first talking with Greg Floyd and getting his expressed consent. Chester Floyd placed a cell phone call to his brother, Greg, and handed the phone to Sgt. Parks. During the ensuing conversation, Parks learned that Greg Floyd owned the apartment; had rented it to Defendant; that Defendant was behind in his rent, and that access to the apartment could be had from the downstairs via a back entrance and stairway. Greg Floyd did not tell Parks he had met with Defendant over dinner and discussed a work out on the past due rent. Greg Floyd did tell Parks he could search the apartment.

Parks and Chester Floyd went to the apartment building. Chester Floyd used a key to enter

the basement area of the house. They walked up an inside stairway to the second floor apartment rented by Defendant. Inside the apartment Parks conducted a warrantless search. During the search, he found a 30-30 caliber rifle in a bedroom leaning against a brick fireplace; a .32 caliber pistol in a pistol bag on or in the drawer of a dresser and a brief case he could not open without damaging. Sgt. Parks seized the guns and brief case during the Friday, January 24, 2003 search because he knew from his investigation that defendant was a convicted felon.

On the Sunday following the search (January 26, 2003) Connie Blake contacted Greg Floyd to obtain Defendant's personal belongings from the apartment. Floyd wanted to see proof that she had the authority of Defendant before releasing Defendant's personal belongings to her. Blake met Floyd at the apartment and showed him the letter dated January 21, 2003 (Government Exhibit 1). Floyd signed Government Exhibit 1 acknowledging he had seen the letter. Blake also signed the letter. Blake claims Floyd refused to release certain items of Defendant's personal property unless the back rent was paid. Floyd denies he held any of Defendant's personal property in distress for the rent. Blake paid Floyd the back due rent ($500.00) and Floyd opened the apartment at which time Blake and helpers packed up and removed Defendant's personal property.

Since January 26, 2003 Blake has sold: the Motor Home for $2,500.00; end tables for $50.00 and a DVD player for $50.00. Blake deposited the money from the sales into her personal account. She believed she owned the property and could do with it what she wanted. During the hearing she stated with respect to the personal property in the apartment: "They were all signed over to me." She did from time to time send Defendant money because he was in jail and had no money. She made it clear it was her choice what if any money to send and when to send it. She felt constrained not to sell Defendant's hunting equipment because Defendant had told her during an earlier conversation

4

that the last property he would sell would be his hunting equipment. Blake did not tell the Court when she had the conversation with Defendant concerning his hunting equipment. However, after Defendant's arrest and execution of the January 21, 2003 letter, Blake and Defendant did not talk or have written communication with each other in which the subject of how to handle disposal of the personal property was mentioned. Blake still has most of the personal property stored in her garage.

On April 2, 2003 Blake delivered the original of the January 21, 2003 letter to the police. According to deputy Parks and BATF Special Agent Hake, this was the first time the police saw the letter. Both Hate and Parks testified the police were not aware of the existence of the letter or its contents prior to the January 24, 2003 search of the apartment.

At some point following the January 24, 2003 search and presumably at the time of the receipt of Government Exhibit 1, the police used the combination shown on the exhibit to open the brief case. In the brief case they found marijuana residue and a pipe. The police retained the pipe and marijuana residue but delivered the remainder of the briefcase and its contents to Blake.

## II.

## Contentions of the Parties

Defendant contends:

1. Defendant's letter to Blake does not undercut Defendant's reasonable expectation of privacy in his personal effects for two independent reasons:

    a. The police never knew the letter existed at the time when the search transpired.

    b. There are circumstances in which a person may surrender immediate control over

personal effects without surrendering his justified expectation of privacy with respect to those effects.

2. The police did not have actual or apparent authority to search the apartment.

The government contends:

1. Defendant has no standing to contest the search of the apartment or the seizure of the property inside the apartment, because he voluntarily abandoned the apartment and the property.

2. The fact that the police did not know of the letter until after the search was completed is irrelevant.

3. The officers could reasonably rely on the landlord's apparent authority to give consent to search the apartment.

## III.

## Discussion

### A. Standing

To challenge a search under the Fourth Amendment, an individual must be able to show that he has standing, i.e., he must show that he himself had a "legitimate expectation of privacy" in the area searched. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct 421, 58 L.Ed.2d 387 (1978); *see also United States v. Salvucci*, 448 U.S. 83, 91-92, 100 S. Ct. 2547, 65 L.Ed.2d 619 (1980). To successfully make this showing, the individual must have a subjective expectation of privacy, and that subjective expectation must be reasonable. *Katz v. States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). A legitimate expectation of privacy is usually demonstrated by showing that the defendant had some property or possessory interest in the area searched. *Rakas*, 439 U.S. at 148. Mere possession of the seized property is insufficient by itself

to establish a legitimate expectation of privacy. *Salucci*, 448 U.S. at 92. The proponent of a motion to suppress bears the burden of showing that he had some interest which rendered his expectation of privacy legitimate. *Rakas*, 439 U.S. at 131 n.1.

In *US v. Leshuk*, 65 F.3d 1105 (4th Cir. 1995), the Fourth Circuit stated:

> The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property. *See Abel v. United States*, 362 U.S. 217, 241, 80 S. Ct. 683, 698, 4 L.Ed. 2d 668 (1960); *United States v. Clark*, 891 F.2d 501, 506 (4th cir. 1989)(per curiam).

## B. Abandonment

Defendant first challenges the government's abandonment theory on the grounds that the officers did not know the letter from Defendant to Blake even existed at the time of the search and seizure, and the government cannot justify the search through after-the-fact acquired information. (Defendant's brief at 3). Neither Defendant nor the Government cite any Fourth Circuit cases, and the undersigned found none on point. Other Federal Courts, have, however, considered and rejected the identical argument. In *Feguer v. United States*, 302 F.2d 214 (8th Cir.) (*cert. denied*, 371 US 872, 83 S. Ct. 123, 9 L.Ed.2d 110 (1962)), Judge Blackmun analyzed the identical issue. The Defendant in that case had moved to suppress evidence which had been found and seized when, with the landlord's permission but without a warrant, officers searched a room Defendant had occupied. The trial court had denied the motion to suppress on the ground that at the time of the search the Defendant had left with the intent not to return, and thus had abandoned the room. The Defendant conceded he had abandoned the room before the search, but stressed this fact was not known to the police or to anyone else at the time. The Defendant suggested that the question of legality of the search is to be determined only by the circumstances which exist at the time of the search. The

government, on the other hand, argued the record was conclusive that the Defendant had abandoned the room prior to the search. Judge Blackmun felt the defense's suggestion that the search was unreasonable because the abandonment of the room was not then known to the police "somewhat intriguing," but without substance, finding:

> Abandonment in fact had been effected before the search. It was purposeful and voluntary and the room's search could not possibly have violated any constitutional right of the defendant.

In *Parman v. US*, 399 F.2d 559 (CADC 1968), the DC Court of Appeals, considering the warrantless search of an apartment, found the record supported a finding that an abandonment had occurred. The appellant argued that "to justify a search by a subsequent finding of abandonment where, at the time, the officers conducting the search have no reason to believe that abandonment has occurred, places serious limitations on the deterrence rationale of the fourth amendment." The court then found "this limitation on the deterrent effect of the exclusionary rule is implicit in the rule that a third party cannot object to illegally seized evidence." (*citing Wong Sun v. U.S.*, 371 US 471, 83 S.Ct. 407, 9 L.Ed2d 441 (1963)).

In *US v. Levasseur*, 816 F.2d 37 (2nd Cir. 1987), the Second Circuit considered the warrantless search of a footlocker:

> The facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure. Rather, subsequently discovered events may support an inference that appellants had already chosen, and manifested their decision, not to return to the property. E.g., *United States v. Callabrass*, 607 F.2d 559, 566 (2nd Cir. 1979)(Oakes, J., dissenting); *Parman v. United States*, 399 F.2d 559, 565 (D.C. Cir. 1968)(Burger, J).

In *Levasseur*, the court of appeals found the district court's finding of abandonment was "buttressed" by a discovery, <u>five months after the warrantless search</u>, that the appellants had settled in another state within days of the search.

8

Finally, in *U.S. v. Winchester*, 916 F.2d 601 (11th Cir. 1990), the Eleventh Circuit upheld the warrantless search of a cottage where the appellant had lived, noting:

> In addition, events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time.

The undersigned finds the decisions in *Feguer, Parman, Levasseur,* and *Winchester* persuasive.

Abandonment exists on two levels in this case. Abandonment of the apartment and abandonment of the personal property located within the apartment. Defendant was arrested on January 21, 2003. He realized he had no expectation of returning to the apartment after his arrest. He knew he was five weeks behind in the rent and that he had no possibility of carrying out his work for rent or work to accumulate rent money arrangement with his landlord. His attorney made virtually the same argument in support of Defendant's claim that the letter of January 21, 2003 created a bailee-bailor relationship between Blake and Defendant. In light of the above realizations, Defendant prepared the letter of January 21, 2003 (Government Exhibit 1). In the letter he refers to himself as the "former renter of the apt. on 642 Court St. Weston W.Va. owned by Greg Floyd ...." There can be no stronger evidence or indication that Defendant was abandoning the apartment and that he no longer had a property or possessory interest in it..

Defendant's second argument is that his letter to Blake "simply established a 'bailor-bailee' relationship so that Blake could access Defendant's possessions through the landlord for a return to Michigan." (Defendant's brief at 3). This argument is without merit. The letter itself, as well as the facts as testified to at the hearing do not support that position. In his letter to Blake, Defendant expressly states:

> On this day, January 21, 2003, I, Lee R. Stevenson, A.K.A. Levi Yoder, ... , hereby <u>transfer/give Ms. Connie Blake, full rights to possession and ownership</u> of all my personal property in Apt. 642.

(Exhibit ) (emphasis added). Defendant further signed the document as "seller/owner," and Blake signed it as "Buyer." The letter itself is entitled, "Receipt for Personal Property." There is no mention of returning the property to Michigan or to Defendant. Only a copy of the "receipt" was to be sent to Defendant in Michigan. Defendant chose the language of the document he prepared. The undersigned finds Defendant, through this letter, unambiguously transferred all his rights in the property to Blake. Further, at the hearing, Blake testified that it was her understanding Defendant had conveyed the property to her and the property was hers to do with as she wished. In fact, she acted on that understanding selling the Motor Home, end tables and a DVD player.

The Court concludes Defendant voluntarily conveyed the personal property located in the apartment to Blake and, as of his delivery of the letter to Blake on January 22, 2003, no longer had any right, title or interest in that personal property. This is tantamount to Defendant having abandoned the personal property. Therefore, Defendant had no reasonable expectation of privacy in the property as of January 22, 2003 and could not be heard to complain about the seizure of some of it by the police on January 24th. He has no standing to challenge the search and seizure of the property.

After the Court wrote the above, Defendant filed his Post-Hearing Memorandum of Law in Support of His Motion to Suppress Evidence in which he raised the already recognized dichotomy of standing relative to the apartment as opposed to the personal effects within the apartment. The Court retracted its already prepared report and recommendation from the Clerk's Office in order to further address the issue in light of ***Alderman v. United States*, 394 U.S. 165 (1969).**

Alderman, Alderisio and Kolod were convicted of conspiring to transmit murderous threats in interstate commerce in violation of 18 U.S.C. §371 and 875(c). While they were affirming their affirmed convictions to the Supreme Court, they learned the Government may have conducted unlawful electronic eavesdropping on Alderisio's place of business and may have overheard conversations that were used at trial. Notwithstanding the Government's objections, the Supreme Court entered a per curium order vacating the order of the Court of Appeals and remanding the case to the trial court for determination of whether any of the prosecution's evidence was the product of illegal surveillance.

The case presented the Court with three issues pertaining to standing:

"(3) What standards are to be applied in determining whether petitioner has standint to object to the use against him of information obtained from such illegal surveillance? More specifically, if illegal surveillance took place at the premises of a particular defendant,
    (a) Does that defendant have standing to object to the use against him of any or all information obtained from the illegal surveillance, whether or not he was present on the premises or party to the overheard conversation.
    (b) Does a co-defendant have standing to object to the use against him of any or all information obtained from the illegal surveillance, whether or not he was present on the premises or party to the overheard conversation?"

The petitioner defendants urged the Court to adopt a rule that "regardless of whose Fourth Amendments rights the surveillance violated at the very least, it is urged that if evidence is inadmissible against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissible against his co-defendant or co-conspirator." Finding this inconsistent with prior cases developing the law relative to the Fourth Amendment and the exclusionary rule created to enforce it, the Court rejected petitioners' view. Id. at 171. The Court relied on the established principle that "suppression of the product of a Fourth Amendment violation

can be successfully urged only by those whose rights were violated." Id. at 171. The Court went on to state: "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Id. at 174. Applying the rationale behind the exclusionary rule, the Court reasoned: "The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." Id. at 174-175.

Applying the rationale to the facts of the *Alderman* case, the Supreme Court held: "In these cases, therefore, any petitioner would be entitled to the suppression of government evidence originating in electronic surveillance violative of his own Fourth Amendment right to be free of unreasonable searches and seizures. Such violation would occur if the United States unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises, whether or not he was present or participated in those conversations." Id. at 176.

Answering the dissents of Mr. Justice Harlan and Mr. Justice Stewart, Mr. Justice White, for the majority wrote: "If the police make an unwarranted search of a house and seize tangible property belonging to third parties – even a transcript of a third-party conversation – the homeowner may object to its use against him, not because he had any interest in the seized items as 'effects' protected by the Fourth Amendment, but because they were the fruits of an unauthorized search of his house, which is itself expressly protected by the Fourth Amendment." It is this very clause that Stevenson,

the defendant in the subject case, now seeks to shield himself with since he conveyed away his standing to object to the search and seizure of the guns.

The problem with Stevenson's argument is that the facts of his case are substantially different from those in *Alderman*. As previously noted, Stevenson was behind in his rent; had no expectation of being able to go back into the apartment; had no way to pay the rent or to trade work for the rent; and referred to himself as the "former renter". The parties in the Alderman case were using the business premises which had been the subject of the illegal surveillance at the time the surveillance was being conducted. Stevenson cannot even say he was using the apartment to store *his property* at the time of the alleged illegal search because he had already given that property to Blake some two days earlier.

This Court elected not to speculate on Stevenson's motive for writing the January 21, 2003 letter. Stevenson would have the Court believe his motive was to preserve his property and to have Blake send it to Michigan for safekeeping. No where in the document is this intent expressed. On the other hand, Stevenson's goal could have been to give Blake authority to get his personal property, particularly the guns and contraband drug residue and pipe, out of the apartment so they would not be available for discovery by the police. No where in the document is this intent expressed. The document itself was clear and unambiguous and rather than speculate, the Court gave the language of the document its literal meaning. Blake owned the personal property. Floyd owned the apartment. Blake could have removed the personal property from the apartment as of January 22, 2003, the date she first received the January 21, 2003 letter. Stevenson could have assigned any remaining interest he had in the lease on the apartment to Blake, if he believed he had any such interest. He did not do so. Instead he selected and used language which described him as the

13

"former renter" of the apartment. Stevenson gave up any interest in the apartment and in the property and accordingly lost his standing with respect to each as of January 22, 2003, a full two days prior to the search by the police.

### C. Apparent Authority

Because the undersigned finds Defendant did not have a reasonable expectation of privacy in the property that is the subject of the motion to suppress, and therefore does not have standing to challenge the search and seizure of said property, it is unnecessary to reach the merits of the government's alternative argument that the officers reasonably relied on the landlord's apparent authority to give consent to the search.

## IV.

## Recommendation

For the reasons herein stated, the undersigned recommends Defendant's motions to suppress (Docket Entry 9) be DENIED.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 6 day of November, 2003.

JOHN S. KAULL

UNITED STATES MAGISTRATE JUDGE